UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

THE REGENCY NYC, INC.,

                              Plaintiff,

                -against-

BARBARA ATKINSON, et al.,

                              Defendants.

---

23-CV-5479 (JGLC)

**OPINION AND ORDER**

JESSICA G. L. CLARKE, United States District Judge:

In November 2019, Plaintiff The Regency NYC, Inc. ("Plaintiff" or "Regency") hired Defendant Barbara Atkinson ("Atkinson"). Regency now alleges that Atkinson sent herself emails from Regency that contained confidential information and trade secrets, which she then used on behalf of her new employer, Defendant Worth Higgins & Associates, Inc. ("Worth Higgins" and together with Atkinson, "Defendants"). Regency claims it lost numerous clients and suffered reputational damages due to these actions. Defendants now move to dismiss the action in its entirety. The Court GRANTS Defendants' motion as to the causes of action for breach of contract, misappropriation of trade secrets, unjust enrichment against Worth Higgins, tortious interference with contract, diversion of corporate opportunity, and constructive trust against Worth Higgins, finding that Plaintiff's claims are legally insufficient. The Court DENIES Defendants' motion as to the causes of action for breach of the duty of loyalty, unjust enrichment against Atkinson, tortious interference with business relations, and constructive trust against Atkinson, finding that Plaintiff alleged sufficient facts to withstand a motion to dismiss.

## BACKGROUND

Plaintiff brings claims for: (1) breach of the duty of loyalty; (2) unjust enrichment; (3) misappropriation of trade secrets; (4) tortious interference with existing and prospective business

relations; (5) diversion of corporate opportunity; (6) constructive trust; and (7) breach of

contract. ECF No. 50 ("Second Amended Complaint" or "SAC") ¶¶ 80–137. The following facts

are, unless otherwise noted, taken from the Second Amended Complaint and presumed to be true

for the purposes of this motion. *See LaFaro v. N.Y. Cardiothoracic Grp., PLLC*, 570 F.3d 471,

475 (2d Cir. 2009).

## I.    Atkinson's Employment at Regency

On or about October 30, 2019, Regency hired Atkinson as an at-will employee in the

position of Vice President of Sales, to work primarily to develop Regency's business and

increase sales for Regency. SAC ¶¶ 10, 12. On November 7, 2019, Atkinson accepted Regency's

offer of employment as per the terms of the offer letter. *Id.* ¶ 11; ECF No. 50-1 ("Offer Letter").

Upon accepting employment, Atkinson received the Regency employee handbook (the

"Employee Handbook"), subjecting her to the handbook's terms, conditions, policies,

procedures, and benefits. SAC ¶ 15. The Offer Letter stated "upon your acceptance and

completion of hiring paperwork, you will be provided with the Company's Employee

Handbook." Offer Letter at 1.

During Atkinson's employment, Regency granted her access to Regency's client base,

proprietary and confidential information, and trade secrets. SAC ¶¶ 14, 21. Regency has

developed non-public confidential and proprietary business information, including, but not

limited to, confidential client contact information; client account information; business needs of

clients; special needs of clients; production services and confidential client financial information,

including costs, profit margins, discounts, rebates, marketing strategies, and tactics; and other

confidential information concerning Regency's business operations, business model, and

marketing techniques. *Id.* ¶ 19. Regency also compiled detailed confidential information

regarding its industry, including current, prospective, and inactive clients, vendors, and members that cannot be determined from public sources. *Id*. ¶ 20.

Regency alleges that Atkinson sent herself emails from Regency that contained confidential and proprietary information, including marketing strategies and other trade secrets. *Id*. ¶¶ 30, 52–53. Atkinson used this information to contact and solicit Regency's client base, vendors, and potential clients. *Id*. ¶ 30. In or about August 2022, Regency's CEO confronted Atkinson regarding the emails she sent to herself, which Atkinson denied having done. *Id*. ¶ 31. In or about mid-November 2022, Atkinson admitted to Regency's CEO that she had stolen Regency's trade secrets, client and vendor contracts, and pricing information for Regency's clients as well as potential clients that Regency was actively soliciting. *Id*. ¶ 54.

After Atkinson resigned, Regency recovered three thousand emails that Atkinson had downloaded and then deleted while employed at Regency. *Id*. ¶ 27. These emails included trade secrets, client and vendor contacts, marketing strategies, and declarations produced by Regency to obtain new clients. *Id*. ¶ 32. Atkinson additionally downloaded all of Regency's customer contacts, data, work product, and vendor contracts, and she attempted to hide doing so. *Id*. ¶ 55. She further forwarded information from her Regency work email to her personal email regarding various business partnerships and exclusive clients of Regency. *Id*. ¶ 56.

Regency further alleges that the trade secrets and work product that Atkinson took consisted of PowerPoint presentations and other marketing materials, email correspondence between Regency and its clients and vendors, and confidential pricing information for Regency's clients. *Id*. ¶ 37. These clients included Langham Hotels & Resorts, Mandarin Oriental, International Luxury Hotel Association, Atelier Ace, the Mandarin Hotel – NY, the Carlyle Hotel,

Avendra, hotel members and contacts of Hilton Worldwide Holdings, Inc. (the "Hilton List"),
Capitol Hill Hotel, and various HMM hotels. *Id.*

Regency alleges that on numerous occasions Atkinson used Regency's proprietary pricing
models to solicit clients exclusive to Regency by submitting bids a few cents less than what
Regency had been charging. *Id.* ¶ 39. She did this to get these clients to sign exclusive contracts
with her new employer, Worth Higgins. *Id.*  Atkinson used Regency's pricing model for key
cards to reach out to Mandarin Oriental NYC to obtain its business on behalf of Worth Higgins.
*Id.* ¶ 23. Specifically, on May 20, 2022, Regency submitted a bid to Mandarin Oriental NYC to
restock key cards. *Id.* ¶ 43. Regency was outbid by Worth Higgins by a few cents per key card, in
or about June 2022. *Id.* On numerous occasions, the Director of Purchasing at Overall Print Items
told Regency that it needed to "sharpen the pencil" with regard to pricing, because every quote
submitted by Regency was a few cents higher than the bids submitted by Atkinson when she was
employed by Worth Higgins. *Id.* ¶ 44. On October 16, 2023, one of the purchasing heads for the
Carlyle Hotel informed Regency that Atkinson had reached out to solicit the Carlyle's business,
submitting a lower bid than did Regency. *Id.* ¶ 45.

Regency also alleges various other ways in which Atkinson harmed Regency's business.
Atkinson refused to invoice customers for all work completed by Regency and, prior to her
separation, advised Regency's clients and vendors to stop working with Regency. *Id.* ¶¶ 71–73.
After Atkinson resigned from Regency, Atkinson contacted Avendra's contract holder for
Regency. *Id.* ¶ 38. Atkinson told Avendra that Regency could not deliver the services under its
contract with Avendra, in an attempt to steal Regency's client. *Id.* Also after Atkinson left, the
Langham Hospitality Group ("Langham") informed Regency that it was no longer viewed
favorably. *Id.* ¶ 41. The Regency executive who took over the Langham portfolio from Atkinson

had to clean up expired contracts and attempt to repair the damage from Atkinson's neglect of the account. *Id*. Atkinson solicited and retained Langham on behalf of Worth Higgins by underbidding Regency for Langham's business using Regency's proprietary pricing model. *Id*. ¶ 42. Nearly all the confidential pricing that Regency submitted to Langham when its contract was up for renewal was slightly higher than that submitted by Worth Higgins. *Id*.

Atkinson's employment at Regency ended when she signed an Employee Separation Notice reflecting her actual last day worked as October 7, 2022. *Id*. ¶ 17; *see also* ECF No. 50-2. Atkinson left Regency to work for and establish a hospitality division at Worth Higgins. SAC ¶ 26. Atkinson shared Regency's trade secrets with Worth Higgins. *Id*. ¶ 35. While Atkinson was employed by Regency, Defendants used this information to solicit and retain existing Regency clients, vendors, and potential clients. *Id*.

As a result of Defendants obtaining Regency's trade secrets and work product, Regency lost numerous clients, potential clients it was actively soliciting at the time of Atkinson's resignation, and suffered reputational damages. *Id*. ¶ 35.

## II.    Regency's Employee Handbook

The Employee Handbook defines "Confidential Information" as:

(i) [C]lient contact information and personal information; (ii) relations between the Company and its clients; (iii) information about decision-makers who have the authority to approve the retention of the Company's services; (iv) particular projects (prior, current or upcoming), needs, or preferences of a client; (v) pricing information; and (vi) the historical quantity and dollar amount of business done between the Company and the client.

*Id*. ¶ 57. It defines "Trade Secrets" as:

Confidential Information such as plans, designs, negative information, computer software, customer lists, non-public financial information, cost and pricing information, branding and marketing strategies, other proprietary information, manufacturing information and information about business opportunities for which reasonable measures are taken to protect the information from disclosure and which derive independent economic value from not being generally known.

*Id*.

As to confidentiality, the Employee Handbook states that "employees that acquire Confidential Information or Trade Secrets about the Company and its clients are expected to handle this information in strictest confidence . . . ." *Id*. Further, "Employees shall not use any Confidential Information or Trade Secrets other than on behalf of and in furthering the business and business interest of the Company." *Id*. Once no longer employed by Regency, former employees "shall not use or otherwise distribute or disseminate the Company's Confidential Information or Trade Secrets on the employee's behalf or that of a third person." *Id*. Furthermore, "[a]ll papers, records, data, notes, files, documents and other materials, including copies and in whatever form, relating to Company business, that an employee possesses or creates as a result of their employment, whether or not confidential, are the sole and exclusive property of the Company." *Id*. ¶ 62.

Regarding "Computer, Internet, Email, and Electronic Device Usage," the Employee Handbook provides that "the email system shall not be used to send (upload) or receive (download) copyrighted materials, trade secrets, proprietary financial information, or similar materials without prior authorization." *Id*. ¶ 61.

The form "Acknowledgement of Receipt of Employee Manual" states:

> I understand that nothing contained in the Manual shall be construed as creating a promise of future employment or benefits or a binding contract with the Company for employment or benefits or for any other purpose. I also understand that these policies and procedures are continually evaluated and may be amended, modified, or terminated at any time with or without notice. Nothing contained in this Manual is a promise, and this Manual does not create an agreement or contract that your employment will continue or is guaranteed, or that the policies, practices, or benefits that are described will always be the same.

ECF No. 58-2 (the "Acknowledgement").[1]

## LEGAL STANDARD

In reviewing a motion to dismiss under Rule 12(b)(6), the Court must "constru[e] the complaint liberally, accepting all factual allegations in the complaint as true, and drawing all reasonable inferences in the plaintiff's favor." *Goldstein v. Pataki*, 516 F.3d 50, 56 (2d Cir. 2008) (internal citation omitted). A claim will survive a Rule 12(b)(6) motion only if the plaintiff alleges facts sufficient "to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556). "Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id*. at 679. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id*. at 678. If a complaint does not state a plausible claim for relief, it must be dismissed. *Id*. at 679.

## DISCUSSION

The Court first analyzes the two claims brought solely against Atkinson. The Court holds that Plaintiff states a claim for breach of the duty of loyalty under the faithless servant doctrine. Plaintiff does not state a claim for breach of contract, because Plaintiff fails to allege the existence of a contract between itself and Atkinson.

---

[1] "[T]he complaint is deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference." *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002).

The Court next analyzes the claims brought against both Defendants. Plaintiff fails to state a claim for misappropriation of trade secrets because Plaintiff did not sufficiently plead the existence of a protectable trade secret. Next, the Court turns to the unjust enrichment claim, which is not duplicative of the breach of contract or misappropriation of trade secrets claims. However, Plaintiff does not allege a sufficiently close relationship between itself and Worth Higgins to sustain the claim against Worth Higgins. The Court analyzes Plaintiff's next claim, stylized as "tortious interference with existing and prospective business relations," as two claims: one for tortious interference with contract and one for tortious interference with business relations. The Court finds that Plaintiff fails to state a claim for tortious interference with contract, because Plaintiff does not allege the existence of contracts between itself and third parties. Plaintiff states a claim for tortious interference with business relations. The Court next holds that Plaintiff fails to state a claim for diversion of corporate opportunity, because Plaintiff does not allege that it had a tangible expectation in opportunities that Defendants allegedly diverted. Finally, Plaintiff's claim for constructive trust is dismissed as to Worth Higgins, but not as to Atkinson.

## I.   Plaintiff States a Claim for Breach of the Duty of Loyalty Under the Faithless Servant Doctrine Against Atkinson

The Court first notes that the parties reference Federal Rule of Civil Procedure 9(b) as applying to Plaintiff's first cause of action. This rule requires that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b); *see also* ECF No. 60 ("Opp.") at 1 ("Since misconduct rising to a breach of fiduciary duties is based upon intentional actions in violation of a party's obligations it is a claim sounding in fraud and Rule 9(b) applies."); ECF No. 61 ("Rep.") at 1 ("Plaintiff admits that its breach of loyalty cause of action . . . should be reviewed under the strict standards of Fed. R. Civ. P.

9(b)."). However, this heightened pleading standard does not in fact apply. *See Garvey v. Face of Beauty LLC*, 634 F. Supp. 3d 84, 92 (S.D.N.Y. 2022) (internal citation and quotation marks omitted) ("Typically, where a plaintiff alleges a breach of fiduciary duty by conduct not amounting to fraud, such as breach of a duty of care, disclosure, or loyalty, the general pleading standards set out by Rule 8(a) of the Federal Rules of Civil Procedure, not the heightened standards of Rule 9(b), apply.").

Turning to the merits of this cause of action, Plaintiff styles it as a breach of loyalty against Atkinson and also states that Atkinson was "paid a salary, commissions, bonuses and other benefits to which she was not entitled under the Faithless Servant Doctrine." SAC ¶ 93. Likewise, Defendants refer to this cause of action as a "claim for breach of loyalty under the faithless servant doctrine." ECF No. 57 ("Mot.") at 10. The Second Circuit has acknowledged that "New York courts are far from clear regarding the contours of—and interplay between—a claim for breach of fiduciary duty and the faithless servant doctrine." *Yukos Cap. S.A.R.L. v. Feldman*, 977 F.3d 216, 242 (2d Cir. 2020).[2] Some courts applying New York law have analyzed claims for breach of the duty of loyalty and claims brought under the faithless servant doctrine as doctrinally distinct, while others have understood them to be essentially the same. *Ebel v. G/O Media, Inc.*, No. 20-CV-7483 (PAE), 2021 WL 2037867, at *4 (S.D.N.Y. May 21, 2021). Here, where both parties treat the claims as the same, the Court will analyze this cause of action as a single claim for breach of the duty of loyalty, brought under the faithless servant doctrine. *See id.*

---

[2] Both Plaintiff and Defendants brief the causes of action under New York law. "[S]uch implied consent is sufficient to establish choice of law." *Krumme v. WestPoint Stevens Inc.*, 238 F.3d 133, 138 (2d Cir. 2000) (quoting *Tehran–Berkeley Civ. & Env't Eng'rs v. Tippetts–Abbett–McCarthy–Stratton*, 888 F.2d 239, 242 (2d Cir. 1989)) (cleaned up).

There is also a lack of clarity in New York law regarding the standard for the faithless servant doctrine. *See LifeSci Cap. LLC v. Revelation Biosciences, Inc.*, No. 22-CV-1411 (JGLC), 2024 WL 3634709, at *2 (S.D.N.Y. Aug. 1, 2024). Under the *Turner* standard, courts focus on whether the alleged misconduct "substantially violates the contract of service." *Yukos*, 977 F.3d at 237 (internal citation omitted). Under the *Murray* standard, "misconduct by an employee that rises to the level of a breach of a duty of loyalty or good faith is sufficient to warrant forfeiture." *Id.* (internal citation omitted). "The key distinction between the two concerns whether the breach of fiduciary duty must be 'substantial.'" *Robinson v. De Niro*, No. 19-CV-9156 (LJL), 2023 WL 4862772, at *56 (S.D.N.Y. May 25, 2023) (citing *id.*).

Moreover, "New York courts have not reconciled any differences between the *Turner* and *Murray* standards or defined the circumstances, if any, in which one standard should apply rather than the other." *Yukos*, 977 F.3d at 237 (internal citation and quotation marks omitted). The Court does not attempt to answer these questions here, because Plaintiff has stated a claim under both standards. *See Phansalkar v. Andersen Weinroth & Co., L.P.*, 344 F.3d 184, 202 (2d Cir. 2003) ("We need not delve further into these questions, however, because we find that Phansalkar's behavior warrants forfeiture under both standards."). Because the Court finds that Plaintiff has plausibly alleged a breach of the duty of loyalty under the *Turner* standard, which requires substantial misconduct, the Court also finds that Plaintiff has plausibly alleged a breach of the duty of loyalty under the *Murray* standard, which "does not require that the misconduct be substantial to justify forfeiture of compensation." *See Robinson*, 2023 WL 4862772, at *56.

"An agent is obligated under New York law to be loyal to his employer and is 'prohibited from acting in any manner inconsistent with his agency or trust and is at all times bound to exercise the utmost good faith and loyalty in the performance of his duties.'" *Pure Power Boot*

*Camp, Inc. v. Warrior Fitness Boot Camp, LLC*, 813 F. Supp. 2d 489, 521 (S.D.N.Y. 2011) (quoting *Phansalkar*, 344 F.3d at 200). "Under the faithless servant doctrine, one who owes a duty of fidelity to a principal and who is faithless in the performance of her services is generally disentitled to recover her compensation, whether commissions or salary." *LifeSci*, 2024 WL 3634709, at *2 (internal citation omitted). "Unlike a traditional claim for breach of a fiduciary duty, an employer bringing a faithless-servant claim is not required to show that it suffered provable damage as a result of the breach of fidelity by the agent." *Ebel*, 2021 WL 2037867, at *5 (cleaned up).

A breach of the duty of loyalty "occurs when a fiduciary commits an unfair, fraudulent, or wrongful act, including misappropriation of trade secrets, misuse of confidential information, solicitation of employer's customers before cessation of employment, conspiracy to bring about mass resignation of an employer's key employees, or usurpation of the employer's business opportunity." *Poller v. BioScrip, Inc.*, 974 F. Supp. 2d 204, 227 (S.D.N.Y. 2013) (internal citation omitted); *see also Farricker v. Penson Dev., Inc.*, No. 07-CV-11191 (DAB), 2010 WL 845983, at *2 (S.D.N.Y. Mar. 4, 2010) (internal citation and quotation marks omitted) ("The duty of loyalty has been limited to cases where the employee, acting as the agent of the employer, unfairly competes with his employer, diverts business opportunities to himself or others to the financial detriment of the employer, or accepts improper kickbacks.").

Regency alleges that Atkinson breached her duty of loyalty by "misappropriating and/or retaining Regency's confidential and proprietary information and [by] conspiring to steal Regency's existing clients and clients Regency was actively soliciting." SAC ¶ 92. The Second Amended Complaint states that Atkinson sent herself thousands of emails with confidential information including, *inter alia*, client, vendor, and member contacts; contracts; pricing models

and information; marketing strategies and presentations; declarations produced by Regency to obtain new clients; and email correspondence between Regency and its clients and vendors. *Id.* ¶¶ 24, 30, 32–34, 37, 47, 52–56. The SAC contains allegations that Atkinson solicited clients exclusive to Regency by submitting bids a few cents less than what Regency had been charging based on this information. *Id.* ¶ 39. Regency alleges that it was outbid by Worth Higgins as to Mandarin Oriental NYC, Overall Print Items, the Carlyle Hotel, and Langham. *Id*. ¶¶ 42–45. Regency further alleges that Atkinson told Avendra that Regency could not deliver the services under its contract with Avendra, in an attempt to steal Avendra as a client. *Id*. ¶ 38. In doing so, Regency alleges, Atkinson made use of Regency's materials and office supplies, including Regency's computers and work email. *Id*. ¶¶ 84, 86.

The Second Amended Complaint thus states a claim for breach of the duty of loyalty. Plaintiff also sufficiently alleges that Atkinson's conduct was substantial, in part because it was not limited to a single isolated incident. *See Phansalkar*, 344 F.3d at 202. Other courts in this Circuit have similarly found such allegations sufficient to state a claim for breach of fiduciary duty under the faithless servant doctrine. *See, e.g.*, *Pawlowski v. Kitchen Expressions Inc.*, No. 17-CV-2943 (ARR), 2017 WL 10259773, at *3 (E.D.N.Y. Dec. 15, 2017) (holding that defendants stated a plausible claim for relief when defendants alleged that plaintiff was a former employee, solicited work that defendant would otherwise have performed, did not tell defendants about this work, and used defendants' tools to perform this work).

That Plaintiff fails to adequately allege the existence of a trade secret, *see infra* Section III, does not defeat Plaintiff's first cause of action, but does mean that Plaintiff cannot base, at this time, the claim for breach of the duty of loyalty on misappropriation of trade secrets. *See JAPNA, Inc. v. SELFX Innovations Inc.*, No. 22-CV-10753 (ALC), 2024 WL 1250269, at *10

12

(S.D.N.Y. Mar. 22, 2024) ("While Plaintiffs have not established their trade secrets claims, they have pleaded sufficient facts that [one defendant] committed a 'persistent pattern' of misconduct by transferring confidential information to herself and to Defendants."); *Garvey*, 634 F. Supp. 3d at 93 (holding that Defendants fail to allege the existence of a trade secret and therefore "cannot premise a claim for breach of fiduciary duty on disclosure of trade secrets").

Defendants' argument that the Employee Handbook contains no restrictive covenants or prohibition against downloading email is unavailing. The duty of loyalty "is not dependent upon an express contractual relationship . . . ." *Pure Power*, 813 F. Supp. 2d at 521 (citing *Phansalkar*, 344 F.3d at 200). Instead, regardless of any agreement, an employee or "[a]n agent is obligated under New York law to be loyal to [her] employer and is prohibited from acting in any manner inconsistent with [her] agency or trust . . . ." *Id.* (internal citation and quotation marks omitted). Accordingly, Defendants' motion to dismiss the claim for the breach of duty of loyalty under the faithless servant doctrine is denied.

## II.     Plaintiff Fails to State a Claim for Breach of Contract

To state a claim for breach of contract under New York law, "the complaint must allege: (i) the formation of a contract between the parties; (ii) performance by the plaintiff; (iii) failure of defendant to perform; and (iv) damages." *Orlander v. Staples, Inc.*, 802 F.3d 289, 294 (2d Cir. 2015) (quoting *Johnson v. Nextel Commc'ns, Inc.*, 660 F.3d 131, 142 (2d Cir. 2011)).

Plaintiff contends that Atkinson entered into a contract with Regency by signing Regency's offer of employment, "which included a specific reference to the Employee Handbook and Atkinson's acceptance of the terms and conditions as stated in it." Opp. at 23–24; *see also* Offer Letter. The Second Circuit has confirmed that "[p]olicies in a personnel manual specifying the employer's practices with respect to the employment relationship . . . may become a part of

the employment contract." *Baron v. Port Auth. of New York & New Jersey*, 271 F.3d 81, 85 (2d

Cir. 2001). However, "[r]outinely issued employee manuals, handbooks and policy statements

should not lightly be converted into binding employment agreements." *Lobosco v. New York Tel.

Co./NYNEX*, 96 N.Y.2d 312, 317 (2001); *see also Azzolini v. Marriott Int'l, Inc.*, 417 F. Supp. 2d

243, 247 (S.D.N.Y. 2005) ("The circumstances under which an employee handbook's assurances

and guarantees create a contract and rebut the presumption of an at will contract are extremely

narrow.").

> The form Acknowledgement states:
>
> I understand that nothing contained in the Manual shall be construed as creating a
> promise of future employment or benefits or a binding contract with the Company
> for employment or benefits or for any other purpose. I also understand that these
> policies and procedures are continually evaluated and may be amended, modified,
> or terminated at any time with or without notice. Nothing contained in this
> Manual is a promise, and this Manual does not create an agreement or contract
> that your employment will continue or is guaranteed, or that the policies,
> practices, or benefits that are described will always be the same.

Acknowledgment. This Acknowledgment "expressly and specifically disavow[s] any intent on

[Regency's] part to accept contractual limitations on its rights as an at-will employer." *Baron*,

271 F.3d at 85–86. Because the Employee Handbook explicitly stated that it "does not create an

agreement or contract," Atkinson "could not have agreed to be contractually bound by its terms

based merely on [her] receipt of the handbook and execution of acknowledgments." *Leary v. Al-

Mubaraki*, No. 18-CV-48 (LTS), 2019 WL 4805849, at *5 (S.D.N.Y. Sept. 30, 2019). Moreover,

Plaintiff does not allege that Atkinson signed the Acknowledgement.

> The language in the offer letter does not remedy Plaintiff's claim. The Offer Letter states

"upon your acceptance and completion of hiring paperwork, you will be provided with the

Company's Employee Handbook." Offer Letter at 1. The Offer Letter does not state, however,

that Atkinson must agree to the Employee Handbook's terms as a prerequisite for employment or

that the Employee Handbook's terms are binding in any way. Even so, the Employee Handbook would not necessarily be binding. *See Leary*, 2019 WL 4805849, at *5–6 (finding that offer letter that stated "[y]our appointment is subject to your acceptance of the terms and conditions contained in the enclosed employee handbook" was "at best ambiguous as to whether it purported to incorporate the provisions of the employee handbook at all"). Because Plaintiff has failed to allege the formation of a contract between Regency and Atkinson, Plaintiff's claim for breach of contract is dismissed.

## III.    Plaintiff Fails to State a Claim for Misappropriation of Trade Secrets

"Under New York common law, 'a plaintiff claiming misappropriation of a trade secret must prove: (1) it possessed a trade secret, and (2) defendant is using that trade secret in breach of an agreement, confidence, or duty, or as a result of discovery by improper means.'" *eShares, Inc. v. Talton*, No. 22-CV-10987 (JGLC), 2024 WL 3970847, at *8 (S.D.N.Y. Mar. 29, 2024) (quoting *Inspired Cap., LLC v. Conde Nast*, 803 F. App'x 436, 440 (2d Cir. 2020)); *see also E.J. Brooks Co. v. Cambridge Sec. Seals*, 31 N.Y.3d 441, 452 (2018). "A trade secret is any formula, pattern, device or compilation of information which is used in one's business, and which gives one an opportunity to obtain an advantage over competitors who do not know or use it." *E.J. Brooks Co.*, 31 N.Y.3d at 453 (cleaned up).

### A.  Plaintiff Fails to Plead the Existence of a Trade Secret

Defendants argue that Plaintiff has not pleaded the existence of a protectable trade secret. New York courts consider the following factors in determining whether information qualifies as a trade secret under the Defend Trade Secrets Act or New York state law:

> (1) the extent to which the information is known outside of [the] business; (2) the extent to which it is known by employees and others involved in [the] business; (3) the extent of measures taken by [the business] to guard the secrecy of the information; (4) the value of the information to [the business] and to [its]

competitors; (5) the amount of effort or money expended by [the business] in developing the information; (6) the ease or difficulty with which the information could be properly acquired or duplicated by others.

*Iacovacci v. Brevet Holdings, LLC*, 437 F. Supp. 3d 367, 380 (S.D.N.Y. 2020) (quoting

*Integrated Cash Mgmt. Servs., Inc. v. Digital Transactions, Inc.*, 920 F.2d 171, 173 (2d Cir.

1990)). "These factors are guideposts, not elements, and it is not necessary to plead every single

factor to state a claim." *Id*. (internal citation omitted).

Plaintiff is also required to identify the purported trade secrets with sufficient specificity.

*Syntel Sterling Best Shores Mauritius Ltd. v. The TriZetto Grp., Inc.*, 68 F.4th 792, 800 (2d Cir.

2023), *cert. denied*, 144 S. Ct. 352 (2023) (citing *Next Commc'ns, Inc. v. Viber Media, Inc.*, 758

F. App'x 46, 48–49 (2d Cir. 2018)). The purportedly misappropriated trade secrets include: (1)

client, vendor, and member contacts; (2) contracts; (3) pricing models and information; (4)

marketing strategies and presentations; (5) declarations produced by Regency to obtain new

clients; and (6) email correspondence between Regency and its clients and vendors (collectively,

the "Confidential Information"). SAC ¶¶ 24, 30, 32–34, 37, 47, 52–56. Atkinson allegedly sent

over 3,000 emails to herself containing this Confidential Information. *Id*. ¶¶ 24, 27–28, 30, 32,

36, 47, 50, 52–53, 56. The Second Amended Complaint therefore describes the Confidential

Information with sufficient specificity "to inform Defendants of what they are alleged to have

misappropriated." *Mujae Grp., Inc. v. Spotify USA Inc.*, No. 20-CV-6719 (AKH), 2021 WL

230207, at *1 (S.D.N.Y. Jan. 7, 2021) (internal citation omitted).

The Second Amended Complaint, however, fails to adequately allege that any of these

items constitute trade secrets. First, Regency has made no argument as to how contracts,

declarations produced by Regency to obtain new clients, or email correspondence between

Regency and its clients and vendors might constitute trade secrets.

Regarding client, vendor, and member contacts, "[g]enerally, where the customers are readily ascertainable outside the employer's business as prospective users or consumers of the employer's services of products, trade secret protection will not attach and courts will not enjoin the employee from soliciting his employer's customers." *Tri-Star Lighting Corp. v. Goldstein*, 58 N.Y.S.3d 448, 454 (2d Dep't 2017) (quoting *Leo Silfen, Inc. v. Cream*, 29 N.Y.2d 387, 392 (1972)). A customer list may constitute a trade secret, however, if it is "developed by a business through substantial effort and kept in confidence . . . , provided the information it contains is not otherwise readily ascertainable." *N. Atl. Instruments, Inc. v. Haber*, 188 F.3d 38, 44 (2d Cir. 1999) (internal citation omitted). Although the "question of whether or not a customer list is a trade secret is generally a question of fact," *id*., here, Regency has not made any factual allegations regarding whether the customer lists, including the Hilton List, were developed through substantial effort or were otherwise readily ascertainable, *see H. Meer Dental Supply Co. v. Commisso*, 702 N.Y.S.2d 463, 465 (3d Dep't 2000) (cleaned up) ("[I]n order to establish confidential customer information status, it is incumbent upon plaintiff to demonstrate that its customers are not known in the trade and are discoverable only by extraordinary efforts.").

Likewise, Regency has not sufficiently pleaded that its pricing models and information constitute trade secrets. Courts differ on whether pricing models constitute trade secrets. *See In re Dana Corp.*, 574 F.3d 129, 152 (2d Cir. 2009) ("Confidential proprietary data relating to pricing, costs, systems, and methods are protected by trade secret law."); *Marietta Corp. v. Fairhurst*, 754 N.Y.S.2d 62, 67 (3d Dep't 2003) (holding that pricing data and market strategies do not constitute trade secrets). Generally, pricing information can constitute a trade secret "where a company uses some type of proprietary formula that gives it a unique advantage, such as a complex pricing or trading algorithm in a financial business." *Free Country Ltd v. Drennen*,

235 F. Supp. 3d 559, 567 (S.D.N.Y. 2016). Here, other than using the word "proprietary" to refer

to its pricing model, Regency makes no factual allegations as how the pricing model is

proprietary. *See 24 Seven, LLC v. Martinez*, No. 19-CV-7320 (VSB), 2021 WL 276654, at *8

(S.D.N.Y. Jan. 26, 2021) (dismissing misappropriation of trade secret claim where plaintiff did

not describe how its process was proprietary, show that the underlying prices were gleaned

through proprietary means, or allege that the pricing information gave plaintiff a competitive

edge over competitors who do not know or use it).[3] And as Defendants note, in a competitive

industry such as theirs, it is possible that "price decisions are made on current competitive

information which fluctuates over time," such that "outdated pricing . . . data would be of scant

value to a competitor today." *Id*. (internal citation omitted).

Courts are also split over whether marketing strategies constitute trade secrets. *See*

*LinkCo, Inc. v. Fujitsu Ltd.*, 230 F. Supp. 2d 492, 499–500 (S.D.N.Y. 2002) ("It is well-

established that marketing concepts and new product ideas are not considered trade secrets.");

*Medidata Sol., Inc. v. Veeva Sys., Inc.*, No. 17-CV-589 (LGS), 2021 WL 467110, at *8 (S.D.N.Y.

Feb. 9, 2021) ("[M]arketing information is protectable."). Regardless, Regency has failed to

allege facts regarding whether its marketing strategies were known outside of the business, the

value of the information to the business and its competitors, the amount of effort or money

expended in developing the information, or the ease with which the information could be

duplicated by others. *See Iacovacci*, 437 F. Supp. 3d at 380. Regency only states in a conclusory

fashion that it developed non-public confidential proprietary business information "at

considerable effort and expense." SAC ¶ 19. Accordingly, Plaintiff has not sufficiently alleged

---

[3] "The elements for a misappropriation claim under New York law are fundamentally the same as
the elements under the DTSA." *Iacovacci*, 437 F. Supp. 3d at 380.

the existence of a trade secret and so cannot sustain a cause of action for misappropriation of

trade secrets.

### IV.    Plaintiff States a Claim for Unjust Enrichment as to Atkinson But Not as to Worth Higgins

Defendants argue that Plaintiff's unjust enrichment claim is duplicative of her claims for

breach of contract and misappropriation of trade secrets against Atkinson. Mot. at 13–14. "An

unjust enrichment claim is not available where it simply duplicates, or replaces, a conventional

contract or tort claim." *Corsello v. Verizon N.Y., Inc.*, 18 N.Y.3d 777, 790 (2012). Rather, "[i]t is

available only in unusual situations when, though the defendant has not breached a contract nor

committed a recognized tort, circumstances create an equitable obligation running from the

defendant to the plaintiff." *Id*. at 791. "An unjust enrichment claim is duplicative if it relies on

the same conduct that forms the basis of the plaintiff's other claims." *Bermudez v. Colgate-

Palmolive Co.*, 667 F. Supp. 3d 24, 44 (S.D.N.Y. 2023) (internal citation and quotation marks

omitted).

"If, however, there is a bona fide dispute as to the existence of a contract or whether the

scope of an existing contract covers the disagreement between the parties, a party will not be

required to elect his or her remedies and may proceed on both quasi contract and breach of

contract theories." *Pauwels v. Deloitte LLP*, 83 F.4th 171, 188 (2d Cir. 2023) (internal citation

omitted). Here, as noted *supra* Section II, Plaintiff has failed to allege the formation of a

contract. Therefore, no contract covers the disagreement between the parties. And

misappropriation is not an element of a claim for unjust enrichment under New York law, so

Plaintiff's claim for unjust enrichment does not necessarily rise or fall with its claim of trade

secret misappropriation. *See id*. Because the only basis Defendants raise to dismiss the unjust

enrichment claim against Atkinson is that it is duplicative of Plaintiff's other claims, the Court rejects Defendants' bid to dismiss the claim against Atkinson.

In contrast, Plaintiff fails to state a claim for unjust enrichment against Worth Higgins. To plead an unjust enrichment claim, "the plaintiff must allege that (1) the other party was enriched, (2) at that party's expense, and (3) that it is against equity and good conscience to permit the other party to retain what is sought to be recovered." *Georgia Malone & Co. v. Rieder*, 19 N.Y.3d 511, 516 (2012) (internal citation and quotation marks omitted). A "plaintiff cannot succeed on an unjust enrichment claim unless it has a sufficiently close relationship with the other party." *Id*.

In analogous situations, New York courts have dismissed unjust enrichment claims. For example, in *Stevens v. Skolnik*, plaintiff and defendant Skolnik spent years developing a project, which defendant Skolnik then shared with defendant Davis. 204 N.Y.S.3d 39, 40 (1st Dep't 2024). The court dismissed the unjust enrichment claim as to defendant Davis, holding that there was not a sufficiently close relationship between plaintiff and defendant Davis. *Id*. at 41. In *Schroeder v. Pinterest Inc.*, plaintiffs alleged that defendant Cohen learned of plaintiffs' ideas and plans, absconded with them, and gave them to defendant Pinterest, which then used the information to develop its website. 17 N.Y.S.3d 678, 683 (1st Dep't 2015). The court affirmed the dismissal of the cause of action for unjust enrichment as to defendant Pinterest, holding that the "complaint alleges only a relationship between plaintiffs and Cohen, and a separate relationship between Cohen and Pinterest, which is too attenuated and insufficient to have caused reliance or inducement." *Id*. at 690 (cleaned up). Here, too, Plaintiff does not allege a sufficiently close relationship between itself and Worth Higgins. The unjust enrichment claim is dismissed as to Worth Higgins.

## V.    Tortious Interference Claims

Plaintiff's fourth cause of action is for "tortious interference with existing and prospective business relations." Although unclear – and although both parties reference, in part, the standard for tortious interference with contract – the Court understands Plaintiff to be pleading two causes of action: one for tortious interference with contract and one for tortious interference with business relations, also known as tortious interference with prospective economic advantage. *See Catskill Dev., L.L.C. v. Park Place Entm't Corp.*, 547 F.3d 115, 132 (2d Cir. 2008).

### A.  Plaintiff Fails to State a Claim for Tortious Interference with Contract

To state a claim for tortious interference with contract under New York law, a plaintiff must allege: "(1) the existence of a valid contract between the plaintiff and a third party, (2) defendant's knowledge of that contract, (3) defendant's intentional procurement of the third-party's breach of the contract without justification, (4) actual breach of the contract, and (5) damages resulting therefrom." *Rich v. Fox News Network, LLC*, 939 F.3d 112, 126–27 (2d Cir. 2019) (quoting *Lama Holding Co. v. Smith Barney Inc.*, 88 N.Y.2d 413, 424 (1996)). Moreover, "a plaintiff must allege that the contract would not have been breached 'but for' the defendant's conduct." *Id*. (quoting *Burrowes v. Combs*, 25 A.D.3d 370 (1st Dep't 2006)).

The Court first notes that although Regency references business relations with various third parties, it does not explicitly allege the existence of contracts between itself and those third parties. And although Regency states that Atkinson had knowledge of such business relationships, it does not allege that Atkinson had knowledge of contracts with third parties or that Worth Higgins had knowledge of any business relationships or contracts. For these reasons

alone, Plaintiff fails to state a claim as to tortious interference with contract, and the Court need not assess whether Plaintiff sufficiently alleged the other requirements.

### B. Plaintiff States a Claim for Tortious Interference with Business Relations

To state a claim for tortious interference with business relations under New York law, a plaintiff must plead that "(1) the plaintiff had business relations with a third party; (2) the defendant interfered with those business relations; (3) the defendant acted for a wrongful purpose or used dishonest, unfair, or improper means; and (4) the defendant's acts injured the relationship." *Garvey v. Face of Beauty LLC*, 634 F. Supp. 3d 84, 94 (S.D.N.Y. 2022) (quoting *16 Casa Duse, LLC v. Merkin*, 791 F.3d 247, 261 (2d Cir. 2015)).

Although Defendants argue that none of the factors are met, the Court finds that the SAC satisfactorily pleads that Regency had business relations with a third party. Regency points to its relationships with companies including the Mandarin Oriental NYC, Overall Print Items, the Carlyle Hotel, Avendra, and Langham. As to the second factor, Regency alleges that Atkinson solicited these clients to Worth Higgins by underbidding Regency.

The third prong of the test is met when the means were wrongful or culpable; the defendant's conduct must amount to a crime or independent tort. *See Carvel Corp. v. Noonan*, 3 N.Y.3d 182, 191–92 (2004); *L. Offs. of Ira H. Leibowitz v. Landmark Ventures, Inc.*, 15 N.Y.S.3d 814, 818 (2d Dep't 2015). "Wrongful means include physical violence, fraud or misrepresentation, civil suits and criminal prosecutions, and some degrees of economic pressure; they do not, however, include persuasion alone although it is knowingly directed at interference with the contract." *Carvel Corp.*, 3 N.Y.3d at 191 (cleaned up). The allegation that "Atkinson actively conspired with malice with Worth Higgins to intentionally and unjustifiably interfere with Plaintiff's business relationships," SAC ¶ 120, is a conclusory statement that is unsupported

by factual allegations. However, Plaintiff also alleges that Atkinson solicited clients in breach of her duty of loyalty, sufficient to meet the third prong. *See Hannex Corp. v. GMI, Inc.*, 140 F.3d 194, 206 (2d Cir. 1998) (holding that participating in a knowing breach of fiduciary duty can constitute wrongful means).

Finally, Plaintiff alleges that Defendants' actions injured Plaintiff's relationships. The Second Amended Complaint states that "Plaintiff has been deprived of substantial revenue that would otherwise have gone to it but for Defendants' unlawful actions" and "Plaintiff has suffered and continues to suffer damages as a result of Defendants' intentional interference with Plaintiff's existing and prospective business relationships with its clients, including loss of revenue and client relationships." SAC ¶¶ 121–22. Accordingly, Defendants' motion to dismiss the cause of action for tortious interference with business relations is denied.

## VI.     Plaintiff Fails to State a Claim for Diversion of Corporate Opportunity

 "Under the doctrine of corporate opportunity, 'corporate fiduciaries and employees cannot, without consent, divert and exploit for their own benefit any opportunity that should be deemed an asset of the corporation.'" *Design Strategies, Inc. v. Davis*, 384 F. Supp. 2d 649, 671–72 (S.D.N.Y. 2005), *aff'd sub nom. Design Strategy, Inc. v. Davis*, 469 F.3d 284 (2d Cir. 2006) (quoting *Alexander & Alexander of New York, Inc. v. Fritzen*, 542 N.Y.S.2d 530, 533 (1st Dep't 1989)). New York courts have applied two tests in determining diversion of corporate opportunity. The first test looks at "whether the corporation had an interest or tangible expectancy in the opportunity." *Id*. (internal citation and quotation marks omitted). The second test asks "whether an opportunity is the same as or is necessary for, or essential to, the line of business of the corporation, and whether the consequences of deprivation are so severe as to

threaten the viability of the enterprise, that the employee is deemed to have violated his fiduciary responsibility." *Id.* (internal citation and quotation marks omitted).

Plaintiff alleges that Atkinson breached "duties as an employee of Plaintiff by, among other things, conspiring, operating and/or performing services for her new subsequent employer, Worth Higgins, in direct competition with Plaintiff by diverting Plaintiff's business and corporate opportunity for Defendants." SAC ¶ 128. Regardless of which test the Court utilizes, Plaintiff fails to plead sufficient facts in support of its claim.

The Second Amended Complaint does not contain allegations that Regency had a "tangible expectancy" in an opportunity with any of the companies for which Atkinson and Worth Higgins allegedly underbid Regency. "An interest or tangible expectancy" is "something much less tenable than ownership, but, on the other hand, more certain than a desire or a hope." *Alexander*, 542 N.Y.S.2d at 534 (internal citation and quotation marks omitted). Regency does not allege anything more than that it placed bids with certain companies with which it had prior contractual relationships and was outbid by Worth Higgins, which is insufficient. *See Pure Power Boot Camp, Inc. v. Warrior Fitness Boot Camp, LLC*, 813 F. Supp. 2d 489, 524 (S.D.N.Y. 2011) ("[Plaintiff] had no tangible expectancy in clients who merely chose not to renew their subscriptions at [Plaintiff]."); *see also Kuo v. Kuo*, No. 96-CV-5130 (CM), 1999 WL 123379, at *4 (S.D.N.Y. Mar. 4, 1999), *aff'd*, 216 F.3d 1072 (2d Cir. 2000) (declining to credit theory that if one party was involved in establishing business contacts with a supplier, all future business between that supplier and a third-party represents diversion of a corporate opportunity for which the first party must be compensated). And although Regency's argument that "Defendants' knowledge that a pre-contract relationship between Regency . . . and Regency's potential clients that was likely to ripen into exclusive contracts was 'special corporation information' and cannot

be exploited by an ex-officer of the corporation" may demonstrate diversion of corporate opportunity, *see* Opp. at 21–22, these facts are not alleged in the Second Amended Complaint. Nor does Regency allege that the viability of its enterprise was threatened. Plaintiff's cause of action for diversion of corporate opportunity is dismissed.

## VII.    Plaintiff States a Claim for Constructive Trust Against Atkinson But Not Against Worth Higgins

"Under New York law, the equitable remedy of a constructive trust is appropriate when there is clear and convincing evidence of (1) a confidential or fiduciary relationship; (2) an express or implied promise; (3) a transfer in reliance on such a promise; and (4) unjust enrichment." *Martha Graham Sch. & Dance Found., Inc. v. Martha Graham Ctr. of Contemp. Dance, Inc.*, 380 F.3d 624, 646 (2d Cir. 2004) (internal citation omitted).[4] "[N]ot all elements need to be met for the court to impose a constructive trust, as the factors are merely guideposts and are not rigidly applied." *City of Almaty v. Ablyazov*, 278 F. Supp. 3d 776, 801 (S.D.N.Y. 2017) (citing *In re Koreag, Controle et Revision S.A. v. Refco F/X Assoc., Inc.*, 961 F.2d 341, 352 (2d Cir. 1992)).

Defendants argue that there is no confidential or fiduciary relationship between Regency and Worth Higgins and that Plaintiff has failed to state a claim for unjust enrichment. Mot. at 21. The Court dismisses the constructive trust claim as to Worth Higgins, because Regency fails to plead a confidential or fiduciary relationship with Worth Higgins. *See Atateks Foreign Trade Ltd. v. Dente*, 798 F. Supp. 2d 506, 507 (S.D.N.Y. 2011) ("[Plaintiff's] failure to allege a confidential or fiduciary relationship with [defendant] is fatal to its claim for a constructive trust."). Because

---

[4] "Whether New York law recognizes a standalone claim for a constructive trust is an open question." *DarkPulse, Inc. v. EMA Fin., LLC*, No. 22-CV-45 (LGS), 2023 WL 2307386, at *8 (S.D.N.Y. Mar. 1, 2023). However, Defendants do not make this argument, and so the Court declines to address it.

Plaintiff has a fiduciary relationship with Atkinson and has stated a claim for unjust enrichment against Atkinson, the claim remains against Atkinson.

## VIII.    Plaintiff Is Granted Leave to Amend in Part

Federal Rule of Civil Procedure 15(a) provides that if a party has already "amend[ed] its pleading once as a matter of course," as Plaintiff has here, a party "may amend its pleading only with the opposing party's written consent or the court's leave." Fed. R. Civ. P. 15(a)(1)–(2). A court should "freely give leave when justice so requires, but it may, in its discretion, deny leave to amend for good reason, including futility, bad faith, undue delay, or undue prejudice to the opposing party." *MSP Recovery Claims, Series LLC v. Hereford Ins. Co.*, 66 F.4th 77, 90 (2d Cir. 2023) (internal citations and quotation marks omitted). The Second Circuit "strongly favors liberal grant of an opportunity to replead after dismissal of a complaint under Rule 12(b)(6)." *Noto v. 22nd Century Grp., Inc.*, 35 F.4th 95, 107 (2d Cir. 2022) (internal citation omitted).

In its opposition to the motion, Plaintiff cursorily seeks leave to amend if the Court "[i]n the event that the Court entertains any doubt as to the sufficiency of the allegations," without specifying how it would cure the pleading deficiencies in the SAC. Opp. at 24–25. Accordingly, the Court has "firm footing to deny such leave." *Loc. 3599, NYC Dep't of Env't Prot. Tech. Pro. Emps. v. City of New York*, No. 23-CV-1035 (JGLC), 2024 WL 966077, at *16 (S.D.N.Y. Mar. 6, 2024) (collecting cases).

Nonetheless, the Court grants Plaintiff leave to file a Third Amended Complaint to the extent that Plaintiff believes it can plead facts that would adequately state claims for misappropriation of trade secrets, tortious interference with contract, and diversion of corporate opportunity against Defendants. Plaintiff is permitted to add factual details to its existing claims, but it may not add any new causes of action not included in the SAC. Plaintiff is reminded that

barebones or conclusory pleading will not pass muster under *Twombly*. Plaintiff is denied leave to amend the breach of contract claim against Atkinson, unjust enrichment claim against Worth Higgins, and constructive trust claim against Worth Higgins.

## CONCLUSION

For the foregoing reasons, the motion to dismiss is GRANTED in part and DENIED in part. The Court dismisses the causes of action for breach of contract, misappropriation of trade secrets, tortious interference with contract, diversion of corporate opportunity, and constructive trust against Worth Higgins. The causes of action for breach of the duty of loyalty, unjust enrichment against Atkinson, tortious interference with business relations, and constructive trust against Atkinson remain. The Court grants Plaintiff leave to file a Third Amended Complaint no later than **October 11, 2024**. The Clerk of Court is directed to terminate ECF No. 56.

Dated:  September 27, 2024
        New York, New York

SO ORDERED.

JESSICA G. L. CLARKE
United States District Judge